CASIMIR W. DYNIEWICZ, as Personal Representative of the Estate of Mark Dyniewicz, deceased, and Carol Dyniewicz, deceased, and HAROLD FREITAG, as Guardian of Jennie Dyniewicz, Missy Dyniewicz, Kelly Dyniewicz, Mark Dyniewicz, and Michael Dyniewicz, minors, Plaintiffs-Appellants, *v.* COUNTY OF HAWAII, STATE OF HAWAII, SLIM HOLT, INC., JOHN DOES 1 - 10, DOE CORPORATIONS 1 - 10, and DOE PARTNERSHIPS, Defendants-Appellees

NO. 10622

(CIVIL NO. 7236)

MARCH 11, 1987

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY BURNS, C.J.

Plaintiff Casimir W. Dyniewicz, as personal representative of the estates of Mark and Carol Dyniewicz, deceased, and plaintiff Harold Freitag, as guardian of Jennie, Missy, Kelly, Mark, and Michael Dynie-

wicz, minor children of Mark and Carol Dyniewicz, deceased (Plaintiffs), appeal the summary judgment in favor of defendant County of Hawaii (County) and the judgment in favor of the State of Hawaii (State). We affirm.

Plaintiffs contest numerous of the trial court's findings of fact and conclusions of law. Upon a review of the record we find that all of the material findings of fact are not clearly erroneous and that all of the material conclusions of law are correct.

The dispositive issues and our answers are as follows:

I. Did the lower court err in concluding that the County was immune from liability for the acts or omissions of its agents while engaged in disaster relief functions in contemplation of or during the March 17, 1980 and March 18, 1980 hundred-year storm in the vicinity of the Hawaii Volcano National Park (Park)? No.

II. Did the lower court abuse its discretion in denying Plaintiffs' August 3, 1984 motion for a jury trial of its claim against the State? No.

On March 17, 1980 Mark and Carol Dyniewicz (Dyniewiczes) arrived at the Hilo airport from California to begin their first Hawaii vacation. They rented a full-size Chevrolet Caprice from Slim Holt Budget Rent A Car, Inc., located at the Hilo airport. The rental contract reflected that Mark Dyniewicz (Mark) received the car keys at 8:12 p.m. and was intended to be the sole driver.

According to the rental contract, Kari Alonzo, then Kari Mizutani (Alonzo), was Slim Holt Budget Rent A Car's rental clerk who rented the car to Mark. She does not specifically remember Mark and cannot recall what she told him. However, Alonzo recalls telling all of her customers that night not to leave Hilo because of the flooding conditions on the roads and numerous road closures. Because Mark listed the Volcano House hotel in the Park as his destination, a reasonable inference is that Alonzo advised him about the weather conditions and that Volcano House reservations that night were being honored by the Sheraton Waiakea Hotel in Hilo. Volcano House is also a Sheraton Hotel.

It was raining heavily when the Dyniewiczes left the Hilo airport. On a clear day it takes approximately forty minutes to drive from the airport to the turnoff to Volcano House, located approximately at milepost 28. There is no evidence of how long it would take to drive from the airport at night under rainy conditions. The Dyniewiczes proceeded from the airport and turned left on the Belt Highway, Route 11. There is

no evidence of the number of the Route 11 milepost in that vicinity. Route 11 from the Park boundary to Ka'u (southwest) is a two-laned road, one lane headed in the Ka'u direction and the other headed in the Hilo (northeast) direction. The Hilo boundary of the Park is approximately .5 miles past milepost 29, and the Ka'u boundary is approximately .5 miles past milepost 39. Mark apparently missed the left turn at about milepost 28 to the Volcano House and continued to drive toward Ka'u.

There is a ford on Route 11 between milepost 49 and the Piikea Bridge, which is located approximately .3 to .4 miles past milepost 49. It is approximately 21 miles from the park turnoff to the ford. The ford is level for approximately 200 feet. There is a box culvert underneath the highway in the middle of the ford, the culvert being ten feet wide and four feet high. This culvert cuts underneath Route 11 at an angle heading in approximately a northwest to southeast direction. This ford area is normally dry but was designed to allow water to cross the roadway during heavy rains. On the Hilo side of the ford, the road descends at approximately a four-degree grade, then tapers off to the level grade. On March 17 and 18, 1980, there were no guardrails in the vicinity of the culvert.

On March 17, 1980 the Island of Hawaii experienced stormy weather conditions. Shortly after 3:00 a.m. on that day, the Civil Defense Administrator for Hawaii County activated civil defense operations. The storm that occurred between 7:00 a.m. on March 17 and 7:00 a.m. on March 18 in the vicinity of the ford and mauka (toward the mountain) or northwest of it was a hundred-year storm, meaning that its frequency of occurrence at such severity would be on the average of once every hundred years.

Throughout March 17, 1980 the Hawaii County Police Department monitored the conditions of Route 11 from Naalehu to the boundary of the Park on the Ka'u side. At approximately 8:30 p.m., on March 17, Route 11 was impassible at Piikea Bridge, just Ka'u of the ford. At about that time, the police department erected a barricade to Hilo bound traffic, approximately .4 miles past milepost 50 at the intersection of Route 11 and Kamani Street, near the town of Pahala. The police department also requested assistance from the National Park Service to close Route 11 to Ka'u bound traffic at Namakani Paio, approximately .4 miles past milepost 31. That barricade was erected at approximately 9:10 p.m. On it was a sign that read "ROAD CLOSED" facing in the

Hilo direction. Both barricades were unmanned after 9:30 p.m. There is no evidence that the Dyniewiczes arrived at Namakani Paio before or after the barricades were erected.

Approximately 15 feet before milepost 49 was a two feet by two feet ford sign which read "FORD/DANGEROUS/WHEN/WATER, TOUCHES RED". The word "FORD" was printed in red and all the other words were in black. The background color of the sign was white. The letters of the word "FORD" were four inches in height and all other letters were three inches in height.

The ford area is very rural and there were no signs or buildings or messages which would have competed with the ford sign for the attention of the traveling public. The location of the ford sign was 695 feet from the culvert directly under the ford and 485 feet from the first guidepost preceding the culvert.

As part of the State's warning system for flooding conditions, the State installed guideposts on the shoulder area adjacent to the roadway. The guidepost system acted as a depth gauge. There were approximately 40 such guideposts, 20 on each side of the roadway approximately 25 feet between posts, half on the Hilo side of the culvert and half on the Ka'u side of the culvert. Each guidepost was painted red on the upper 24 inches of the post and the bottom of the red was designed to be placed at an elevation 6 inches above the center line on the roadway. The part of the guidepost below that portion painted red was gray in color. The red was not reflectorized.

Under the guidepost system designed and installed by the State, the bottom of the red was not level throughout but followed the contour of the center line of the roadway. The first six posts from the culvert were level, but the posts further away from the culvert in the Hilo direction increased in elevation with the grade of the roadway. So, if water is uniformly level, although water may touch red on the first six posts from the culvert, the red may not be touched at the four posts further away from the culvert.

Uncontradicted testimony produced by the Plaintiffs was that it takes 1.4 feet of water moving at a velocity of 8 feet per second or greater to move a compact car, and it takes 1.6 feet of water to move a medium or larger size car at the same velocity. The lower court found that the State's guidepost system marking the red at 6 inches above the center line level was consistent with good engineering practice.

The assumption is that sometime during the late evening of March

17, 1980, or the early morning of March 18, 1980, the Dyniewiczes' car floated off the road in the area of the ford. The car was found in the stream bed on March 25, 1980, about 417 feet from the makai (toward the ocean) or southeast edge of the ford. There is no evidence of the distance from the top of the culvert to the stream bed, or the road to the stream bed. The car's condition was as if it had rolled over on its sides a few times, and when found it was lying on its roof. The bodies of the Dyniewiczes were found inside the car. The headlight switch was in the "off" position, and the transmission was in "park". The keys were in Mark's trouser pocket. The coroner's report stated that Carol died from multiple injuries sustained in the accident, and that Mark died from asphyxia and other injuries sustained in the accident.

There was no evidence of any other vehicle having been washed off the ford during its 30 plus years of existence.

On March 25, 1980 Governor Ariyoshi issued a written proclamation determining that a major disaster had occurred in the County of Hawaii in the districts of Puna, Ka'u, South Hilo, North Hilo, Hamakua, South Kohala, and North Kohala during the period March 14, 1980 to March 25, 1980. However, the proclamation stated "that this determination is made for the sole purpose of authorizing the expenditure of State moneys from general revenues of the State for the immediate relief of the damage resulting from said heavy rains and flooding in said County".

On October 7, 1981 Plaintiffs sued the State, the County, Slim Holt, Inc., and Doe corporations, partnerships, and individuals for the wrongful death of the Dyniewiczes. Plaintiffs demanded a jury trial. On May 12, 1982 Slim Holt Budget Rent A Car, Inc., was identified as Doe Corporation I. On May 26, 1982 the lower court granted Slim Holt, Inc., and Slim Holt Budget Rent A Car, Inc.'s January 27, 1982 motion for summary judgment. On January 25, 1984 the lower court granted the County's November 8, 1983 motion for summary judgment.

On August 3, 1984 the State filed its notice of nonconsent to jury trial. On the same date Plaintiffs filed a motion for an order enforcing demand for jury trial, which the lower court denied on August 7, 1984. In the bench trial which commenced on August 13, 1984, the lower court found that the Plaintiffs failed to prove negligence and proximate causation and entered judgment in favor of the State.

I.

Plaintiffs contend that the January 25, 1984 summary judgment in favor of the County was wrong. We disagree.

Plaintiffs do not contest the lower court's finding that the State, and not the County, was responsible for the design, construction, maintenance, and inspection of the roadway, the ford, and the stream bed.

The relevant allegations of Plaintiffs' complaint that Plaintiffs wanted tried are as follows:

15. Defendant County of Hawaii was negligent:

\* \* \*

b. In failing to take reasonable measures to prevent injury to travelers on or about said location, although Defendant County of Hawaii had notice or knowledge or under the circumstances should have had notice or knowledge, of the reasonable likelihood of danger from flooding and accumulation and runoff of rainfall.

c. In failing to properly patrol or provide adequate precautions on the highway under the conditions of heavy rainf[a]ll existing at the time and place of the accident described herein.

\* \* \*

g. In failing to post and maintain proper traffic warning signs, signals, and highway lamps or illumination at a meaningful distance to warn approaching users of the highway of the possibility of flooding, and accumulation and runoff of rainfall.

h. In failing to barricade properly or block said highway in a timely manner to prevent the use of said highway under the conditions then existing, and failing to warn drivers on the main highway of the potential hazard by traffic signs and signals.

The lower court dismissed these claims "on the ground that the County is immune from personal injury claims arising during the performance of civil defense functions under HRS § 128-18."

HRS § 128-18 (1985) provides in relevant part as follows:

Immunities; rights. Neither the State nor any political subdivision . . . engaged in civil defense functions pursuant to this chapter . . . shall be liable for the death of or injury to persons, or for damage to property, as a result of any act or omission in the course of the employment or duties[.]

HRS § 127-10 (1985) provides as follows:

Disaster relief during suspension of preceding sections.   During any period in which sections 127-1 to 127-9 are not in effect, the governor and political subdivisions may exercise any and all of their powers that relate to disasters resulting from enemy attacks, in order to provide other disaster relief. All provisions of law that relate to disasters resulting from enemy attacks during such period are made applicable to other disaster relief, including without limitation, provisions making or authorizing appropriations or expenditures.

As used in this section "other disaster relief" means the preparation for and the carrying out of all functions, other than functions for which military forces are primarily responsible, to minimize and repair injury and damage resulting from disasters caused by fire, flood, tidal wave, volcanic eruption, earthquake, or other natural causes and major disasters caused by acts of man, including but not limited to, massive oil spills, nuclear accidents, airplane crashes and civil disturbances.

HRS §§ 127-1 to -9 are now and have been suspended since 1951. *See* Act 35, § 1, 1961 Haw. Sess. Laws 34; Act 268, § 1, 1951 Haw. Sess. Laws 606, 607.

Thus, for purposes of this case, HRS § 128-18 provides in relevant part as follows:

Immunities; rights.   Neither the State nor any political subdivision . . . engaged in [disaster relief] functions pursuant to this chapter . . . shall be liable for the death of or injury to persons, or for damage to property, as a result of any act or omission in the course of the employment or duties[.]

Under HRS § 128-18, as modified by HRS § 127-10, the County is immune from liability to Plaintiffs for any act or omission while it is engaged in disaster relief functions. When read in the light of the undisputed facts of this case, paragraphs 15b, c, g, and h of Plaintiffs' complaint allege only negligent disaster relief functions. Accordingly, the County is immune from liability for those alleged negligent acts or omissions.

We find no merit in Plaintiffs' argument that the County could not have been engaged in disaster relief functions because the Governor did not issue an unrestricted proclamation of the existence of a disaster. In our view, Plaintiffs misread HRS § 128-18, as modified. The Governor's

proclamation pursuant to HRS § 128-7 (1985)[1] of the existence of a disaster is a prerequisite to the exercise of the additional powers described in HRS § 128-8 (1985).[2] It is not a prerequisite to the exercise of

[1]HRS § 128-7 provides:

Civil defense emergency period. The term "civil defense emergency period" includes (1) a period of civil defense emergency proclaimed pursuant to the Federal Civil Defense Act of 1950, or (2) the period of the existence of a state of civil defense emergency in the State hereby authorized to be proclaimed by the governor if the governor finds that an attack upon the State has occurred or that there is danger or threat thereof, or that there has arisen any state of affairs or circumstances of such a grave nature as to affect the common defense or the readiness of the community to meet an attack, and which requires the invocation of provisions of this chapter that are effective only during a period of civil defense emergency. The governor shall be the sole judge of the existence of the danger, threat, state of affairs, or circumstances. A period of civil defense emergency proclaimed pursuant to the Federal Civil Defense Act of 1950 shall terminate as therein provided, and a period of civil defense emergency proclaimed by the governor shall terminate upon proclamation by the governor.

[2]HRS § 128-8 provides:

Additional powers in a civil defense emergency period. The governor may in the event of a civil defense emergency period exercise the following additional powers pertaining to civil defense:

(1) Protective devices, shelters, first aid stations.

(A) Require that persons provide themselves with protective devices;

(B) Require the installation or provision of protective devices and shelters in or appurtenant to dwellings, hotels, factories, and other places of business, office buildings, hospitals, schools, and theaters, and other places where the public congregate; and

(C) Require the installation or provision of first aid stations with the necessary materials and personnel in or appurtenant to hotels, factories, and other places of business, office buildings, schools, and theaters, and other places where the public congregate.

(2) Quarantine, immunizations, etc., nuisances. Provide for and require the quarantine or segregation of persons who are affected with any infectious, communicable, or other disease dangerous to the public health and safety, or persons who are the source of other contamination, in any case where in the governor's opinion the existing laws are not adequate to assure the public health and safety; provide for the care and treatment of the persons; supplement the provisions of sections 325-31 to 325-37 concerning compulsory immunization of persons against disease and institute additional compulsory immunization programs; provide for the isolation or closing of property which is a source of contamination or is in a dangerous condition in any case where, in the governor's opinion, the existing laws are not adequate to assure the public health and safety, and designate as public nuisances acts, practices, conduct, or conditions which are dangerous to the public health or safety or to property; authorize that public nuisances be summarily abated, and if need be that the property be destroyed, by any police officer or authorized person, or provide for the cleansing or repair of property, and if the cleansing or repair is to be at the expense of the owner, the procedure therefor shall

the general powers described in HRS § 128-6 (1985)[3] or § 127-10 or to the immunity afforded by HRS § 128-18, as modified by HRS § 127-10.

---

follow as nearly as may be the provisions of section 322-2, which are made applicable; further, authorize without the permission of the owners or occupants, entry on private premises for any of such purposes.

(3) Police and fire departments.  Summarily remove or suspend, any other law to the contrary notwithstanding, any member of a police commission, chief of police, chief of a fire department, police officer, or firefighter.

(4) Suspension of laws.  Suspend any law which impedes or tends to impede or be detrimental to the expeditious and efficient execution of, or to conflict with, civil defense or other emergency functions, including without limitation, laws which by this chapter specifically are made applicable to civil defense personnel.

[3]HRS § 128-6 provides:

Civil defense powers, in general.  The governor may:

(1) Plans and programs.  Prepare comprehensive plans and programs for the civil defense of this State, the plans and programs to be integrated into and coordinated with the civil defense plans of the federal government and of other states to the fullest possible extent; and coordinate the preparation of plans and programs for civil defense by the political subdivisions of the State, the plans to be integrated into and coordinated with the civil defense plans and programs of the State to the fullest possible extent.

(2) Training, public information.  Institute training programs and public information programs.

(3) Direct operational control, when.  In the event of disaster or emergency beyond local control, or which in the opinion of the governor is such as to make state operational control necessary, assume direct operational control over all or any part of the civil defense functions within this State.

(4) Insignia.  Provide or authorize suitable insignia of authority for all authorized personnel.

(5) Registration and blood typing.  Provide for:

(A) Compulsory registration and identification to the extent that voluntary registration and identification has not been accomplished under chapter 28; and

(B) Compulsory RHo blood typing on females of child bearing age or younger, and such other compulsory blood typing as may be approved by competent medical authority.

(6) Protection of facilities.  Require each public utility, or any person owning, controlling, or operating a vital facility, to protect and safeguard its or the person's property, or to provide for the protection and safeguarding; and provide for the protection and safeguarding of all public properties, or such other properties as the governor may consider advisable; provided that without prejudice to the generality of the foregoing two clauses, the protecting and safeguarding may include the regulation or prohibition of public entry thereon, or the permission of the entry upon such terms and conditions as the governor may prescribe.

(7) Explosives, etc.  Whenever in the governor's opinion the laws of the State do not adequately provide for the common defense, public health, safety, and welfare, investigate, regulate, or prohibit the storage, transportation, use, possession, maintenance, furnishing, sale, or distribution of, as well as any transaction

We construe the immunity described in HRS § 128-18, as modified by HRS § 127-10, to apply whenever the County is actually engaged in disaster relief functions whether or not the Governor issues a proclamation. In this case, it is undisputed that the harm complained of happened during the occurrence of and as a consequence of a natural disaster and while the County was actually engaged in disaster relief functions.

## II.

Plaintiffs contend that the lower court reversibly erred when it denied their August 3, 1984 motion for a jury trial of its claim against the State. We disagree.

Plaintiffs' claim against the State sounds in tort and is governed by the State Tort Liability Act, HRS chapter 662. Although Plaintiffs demanded a jury trial when they filed their complaint, they had no

---

related to, explosives, firearms, and ammunition (including the power to require the re-registration of firearms), inflammable materals and other objects, implements, substances, businesses or services of a hazardous or dangerous character, or particularly capable of misuse by disloyal persons or the enemy, or obstructive of or tending to obstruct military operations or civil defense, including, without limitation, intoxicating liquor and the liquor business; and authorize the seizure and forfeiture of any such objects, implements, or substances unlawfully possessed, as provided in section 128-28.

    (8) Air raid drills, etc.   Direct or control, as may be necessary for civil defense.

      (A) Air raid drills, and other alerts, tests, and exercises;

      (B) Blackouts and practice blackouts;

      (C) Partial or full mobilization of civil defense organizations in advance of actual disaster;

      (D) Warnings and signals for drills, alerts, or attacks, and the mechanical devices to be used in connection therewith;

      (E) Shutting off water mains, gas mains, electric power connections, or suspension of other services; and to the extent permitted by or under federal law, suspension of radio transmission;

      (F) The conduct of civilians and the movement and cessation of movement of pedestrians and vehicular traffic during, before and after blackouts, drills, alerts, or attacks;

      (G) Traffic control;

      (H) The congregation of the public in stricken or danger areas or under dangerous conditions; and

      (I) The evacuation and reception of the civilian population, provided that only during a civil defense emergency period shall there be instituted under this paragraph mandatory or prohibitory requirements having the force and effect of law.

absolute right to a trial by jury against the State because HRS § 662-5 (1985) provides: "Jury.   Any action against the State under this chapter shall be tried by the court without a jury; provided that the court, with the consent of all the parties, may order a trial with a jury whose verdict shall have the same effect as if trial by jury had been a matter of right."

Under HRS § 662-5 Plaintiffs are not entitled to a jury trial of its claim against the State unless (1) Plaintiffs demand a jury trial in accordance with Rule 38 of the Hawaii Rules of Civil Procedure; (2) the State consents; and (3) the court so orders.

Plaintiffs satisfied requirement (1).

Plaintiffs did not satisfy requirement (2). They contend that from the time the State filed its initial pleading to the time it filed its nonconsent to a jury trial the State acted as if it was consenting to a jury trial of Plaintiffs' claims against it. Consequently, they argue that the State impliedly consented to a jury trial or waived or are estopped from asserting its right not to consent to a jury trial. In our view, however, the "consent" required by HRS § 662-5 cannot be involuntary or implied. It must be voluntary and express.

Plaintiffs did not satisfy requirement (3).

Affirmed.

*Ronald G.S. Au* (*Connie G. W. Meredith* with him on the briefs) for plaintiffs-appellants.

*Christopher Yuen* (*Patricia K. O'Toole* on the brief), Deputy Corporation Counsels, County of Hawaii, for defendant-appellee County of Hawaii.

*Charles F. Fell,* Deputy Attorney General, for defendant-appellee State of Hawaii.